UNITED STATES DISTRICT COURT
<u>WESTERN DISTRICT OF NEW YORK</u>            20-CR-6093 (FPG)
UNITED STATES OF AMERICA

                                                                        OBJECTIONS TO PSR AND
                                                                         DEFENDANT'S SENTENCING
                v.                                          STATEMENT AND REQUEST
FRANK SALERNO                          FOR A NON-GUIDELINE SENTENCE
_____

       JEFFREY L. CICCONE, Assistant Federal Public Defender for the Western District of New York affirms as follows:

       I am licensed to practice law in the State of New York and the United States District Court for the Western District of New York, and I represent the defendant, Frank Salerno.

       The factual representations made in this Statement are based on investigations by members of my office, including a forensic examination of the electronic evidence in this case, conversations with Frank Salerno, an examination of education and medical records, a review of the Presentence Investigation Report (hereinafter PSR), dated September 3, 2020, and the following exhibits:

       Exhibit A: Character Reference Letter by Chassity Kumlat-Gacusana; and

       Exhibit B: Letter of Acceptance written to the Court by Frank Salerno.

## BACKGROUND

       On July 9, 2020, Frank Salerno pled guilty to a single count of receipt of child pornography, in violation of Title 18 United States Code §2251(a). Sentencing is currently scheduled for October 8, 2020.

       The written plea agreement entered into by the parties anticipated an advisory Sentencing Guidelines range of 168 to 210 months. The Sentencing Guidelines range

calculated within the PSR is 210 to 240 months.  The difference is due to the PSR's inclusion of a two-point sentencing enhancement for the commission of a sex act, pursuant to U.S.S.G §2G2.1(b)(2)(A).  The defense objects to the inclusion of this enhancement.

## OBJECTION TO THE PSR

The PSR's application of Guidelines enhancement §2G2.1(b)(2)(A) is based on text messages in which Frank Salerno asked the minor victim to send images of herself masturbating.  According to the PSR, such images constitute sexual contact, triggering application of the two-point enhancement.  *See* PSR ¶ 63.  The defense objects to this enhancement.

The Guidelines specifically require a two-point enhancement if the offense involved "the commission of a sexual act or sexual contact."  U.S.S.G. §2G2.1(b)(2)(A).  Application Note 1 incorporates the definitions set forth in 18 U.S.C. §2246(2)-(3).  "Sexual act" is "the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person."  18 U.S.C. §2246(2)(D).  "Sexual contact" is "the intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person."  18 U.S.C. §2246(3).  The question, therefore, is whether the image of a victim touching herself satisfies the definition of either a sexual act or sexual contact.  Unfortunately, this question has yet to be resolved by the Second Circuit.  Other courts have gone in both directions.

In *United States v. Starr*, 486 F.Supp.2d 940 (N.D. Iowa 2007), the Northern District of Iowa addressed the exact issue present here. In that case, the court specifically ruled that a video involving a minor victim masturbating, which was created at the request of the defendant, did not satisfy the requirements of §2G2.1(b)(2)(A). According to the Court, acts of masturbation did not trigger the enhancement under the Guidelines. *Id*. at 947 (citing *United States v. Hayward*, 359 F.3d 631, 640 (3d Cir. 2004; *Levi v. Holt*, 192 Fed.Appx. 158, 160-62 (3d Cir. 2006); *Smith v. Fed. Bureau of Prisons*, 2007 WL 1225546, *2 (W.D. Va. 2007); *McRea v. O'Brien*, 2007 WL 128325, *1 n.2 (W.D. Va. 2007)). The Court further recognized that its legal reading of the relevant definitions "does not accord with commonsense," but found that it was nonetheless "obliged to apply the plain language of the statute." *Id.* (citing *United States v. Oslund*, 453 F.3d 1048, 1062 (8th Cir. 2006)). "It is within Congress's prerogative to advise harsher sentences upon child pornographers who have physical sexual contact with their victims." *Id.*; *but see United States v. Pawlowski*, 682 F.3d 205, 212-13 (3d Cir. 2012) (finding masturbation by the minor victim satisfied the definition of sexual contact, but not sexual act); *United State v. Shafer*, 573 F.3d 267, 277-78 (6th Cir. 2009)(finding sexual contact with oneself sufficient to trigger §2G2.1(b)(2)(A) enhancement).

The defense argues that the Court should adopt the reasoning of those courts that have held masturbation by the victim does not constitute a sex act or sexual contact. Thus, the Court should reject the PSR's Guidelines calculation and decline to apply the two-point enhancement of U.S.S.G. §2G2.1(b)(2)(A).

## GENERAL SENTENCING AUTHORITY

Under 18 U.S.C. §3553(a), federal sentencing courts must impose a sentence that is *sufficient, but not greater than necessary*, to meet the purposes of sentencing. This includes the

3

nature and circumstances of the offense and the history and characteristics of the defendant, the need to avoid sentencing disparities between defendants with comparable criminal records who have been convicted of similar crimes, and the Guidelines themselves. *See United States v. Dorvee*, 616 F.3d 174, 182-83 (2d Cir. 2010) (quoting 18 U.S.C. §3553(a)(1)-(6)).

The "sufficient, but not greater than necessary" language of §3553 is commonly referred to as the "parsimony clause." *United States v. Williams*, 475 F.3d 468, 476 (2d Cir. 2007). When imposing sentence, the district court must consider the factors mentioned in §3553(a), including the requirements of the parsimony clause. *Id.* Simply stated, if the district court concludes that either of two sentences would properly serve the statutory purposes of §3553(a), application of the parsimony clause compels imposition of the lesser sentence. *See United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006).

The sentencing court must also consider the advisory Sentencing Guidelines. *United States v. Booker*, 543 U.S. 220, 245-246 (2005). However, "[e]ven where a district court has properly calculated the Guidelines, it may not presume that a Guidelines sentence is reasonable for any particular defendant, and accordingly, must conduct its own independent review of the §3553(a) sentencing factors." *United States v. Dorvee*, 616 F.3d at 182 (citing *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008)).

The importance of individualized sentencing is a central theme in federal criminal law. It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, and sometimes magnify, the crime and the punishment to ensue. *Koon v. United States*, 518 U.S. 81, 113 (1996).

In *Booker*, the United States Supreme Court emphasized the importance of reserving sentencing discretion to federal district court judges. The Court held that:

> The federal sentencing statute . . . requires a sentencing court to consider Guidelines ranges . . . ., but it permits the court to tailor the sentence in light of other statutory concerns as well.

543 U.S. at 245-246.

The Court thereafter reaffirmed its position in *Kimbrough v. United States*, 552 U.S. 85 (2007) stating that:

> The sentencing judge . . . has greater familiarity with ... the individual case and the individual defendant before him than the Commission or the appeals court. . . . He is therefore in a superior position to find facts and judge their import under § [3553(a)] in each particular case.

*Id.* at 108 (internal quotations omitted).

## U.S.S.G. §2G2.2 IS FUNDAMENTALLY DIFFERENT FROM MOST OTHER GUIDELINES AND MUST BE APPLIED WITH GREAT CARE

It is now generally accepted that the Sentencing Guidelines in child pornography cases (§2G2.2) frequently result in sentences that are significantly higher than necessary. These challenges were most notably addressed in *United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010). In that case, the Second Circuit acknowledged that the §2G2.2 Guideline is fundamentally different from most and that, unless applied with great care, can lead to unreasonable sentences that are inconsistent with what §3553 requires. *Id.* at 184.

The Department of Justice's Office of Policy and Legislation has also recognized the problems inherent in the application of the child pornography Guidelines. In a letter to the

Sentencing Commission, the Department of Justice asked the Commission to review "and consider amendments to those guidelines that have lost the backing of a large part of the judiciary.  These reviews should begin with the guidelines for child pornography possession offenses..."  *See* Letter to the Honorable William K. Sessions, III, United States Sentencing Commission, by Jonathan J. Wroblewski, Director, Office of Policy and Legislation, Department of Justice, Criminal Division, dated June 28, 2010.

In 1997, the average defendant convicted of possessing, receiving or distributing child pornography received a mean sentence of 20.59 months.  *See* Troy Stabenow, Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines, http://www.fd.org/pdf_lib/child%20porn%20july%20revsion.pdf (2009).  Only ten years later, in 2007, defendants sentenced for the same conduct received a mean sentence of 91.30 months – an increase of 443%.  This dramatic increase was not based upon empirical research demonstrating a need for incrementally harsher sentences.  Rather, it was the result of numerous Congressional mandates that were clandestinely attached to larger legislation, often passing without notice, debate or scrutiny of any kind.  The result for most defendants is a guideline range that is a stark violation of §3553 because it recommends a sentence far greater than necessary to satisfy the purposes of sentencing.

Today's child pornography guidelines include numerous possible enhancements that were presumably intended to increase the sentences for the most egregious offenders.  In reality, however, these Guidelines do little to differentiate the degree of culpability among offenders because essentially all of the enhancements apply in most every case.  *See United States v. Jenkins*, 854 F.3d 181, 188-89 (2d Cir. 2017).  In *Dorvee*, the Second Circuit rejected a guideline range for a first-time offender on the grounds that the child pornography guidelines were

"fundamentally incompatible with §3553(a)." 616 F.3d at 187.  The Court specifically noted that the Guidelines' sentencing enhancements result in a recommended sentence "near or exceeding the statutory maximum, even in run-of-the-mill cases." *Id*. at 186.

The Second Circuit reminded district court judges that they "may vary from the Guidelines range based solely on a policy disagreement with the Guidelines."  616 F.3d at 188 (quoting *United States v. Cavera*, 550 F.3d 180, 191).  Moreover, "judges are encouraged to take seriously the broad discretion they possess in fashioning sentences under §2G2.2 – ones that can range from non-custodial sentences to the statutory maximum – bearing in mind that they are dealing with an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results." 616 F.3d at 188.

The warnings from the circuit court opinions, the sentencing judges, the Department of Justice, and commentators, are consistent.  The application of the §2G2.2 guidelines results in significantly high sentences for all offenders.  Unless the Guidelines are applied with great care, they can lead to unreasonable sentences inconsistent with the requirements of §3553.

### THE NATURE OF THE OFFENSE AND THE HISTORY
### AND CHARACTERISTICS OF THE DEFENDANT

Frank Salerno was born in New Hampshire to an abusive father and a mother who was incapable of raising him.  Eventually, at the age of seven, Frank and his brother were removed from their parents and placed in a children's home.  The siblings were initially kept together, however, Frank's brother was diagnosed with Asperger's Syndrome and they were subsequently separated.  At the age of ten, Frank was adopted by Jim and Carla Salerno.  Although his adoptive family was loving and supportive, Frank suffered from several mental

7

health concerns relating to his early childhood experiences.  Frank was placed in special education classes for both middle school and high school.

Shortly after graduation from high school, Frank enlisted in the Army National Guard. Unfortunately, in 2013, he experienced a mental health breakdown based on his exposure to the aftermath of the Boston Marathon bombing.  Frank was moved to a communications unit and eventually honorably discharged in 2015 for medical reasons.

**Frank Will Not Get the Mental Health Treatment He Needs in the Bureau of Prisons**

Frank has suffered from depression and suicidal thoughts for many years.  He needs mental health treatment.  Unfortunately, he is not likely to receive that treatment while incarcerated in the BOP.

Mental health treatment in the Bureau of Prisons is designed to keep inmates and those around them safe. While the Department of Justice estimates that one in four inmates in this country suffers from a diagnosable mental health disorder, "rarely will an inmate receive any meaningful treatment for underlying disorders such as PTSD, Major Depressive Disorder, Bi-Polar Disorder, and the like …."  *See* Ellis, Alan and Allenbaugh, Mark, "Mental Health Care in the Bureau of Prisons," The National Trial Lawyers, April 13, 2017.   http://alanellis.com/wp-content/uploads/2017/04/mental-health-care-in-bureau-of-prisons.pdf.

In 2014, the Bureau of Prisons adopted a new mental health policy intended to increase the standards of care for inmates with mental illness.  *See* https://www.bop.gov/policy/progstat/5310_16.pdf.  However, as of 2015, only 3% of sentenced federal inmates were being treated for mental illness. A 2016 Performance Budget Congressional Submission indicated that, at the very least, 19% of BOP inmates had a history of mental illness.

Furthermore, as of October 2015, the Bureau of Prisons had filled just 57% of full-time psychiatrist positions.  See **https://oig.justice.gov/reports/2017/e1705.pdf**, accessed, March 2, 2020.  The overwhelming odds are that Frank will not be one of the lucky 3% of inmates who receives meaningful mental health treatment while incarcerated.

### Frank Will Always be at Risk of Danger in the Bureau of Prisons

As a convicted sex offender, Frank will face a higher risk of danger within the Bureau of Prisons.  Those convicted of child pornography crimes are on the bottom rung in the hierarchy of prison inmates. *Zoukis*, a prison law blog reports the following:

> Incarcerated sex offenders have a rough time in prison. At the higher security levels (e.g., high and medium security federal prisons), they tend to be harassed, attacked, and brutalized. This is part of an institutional culture if not supported by the prison administration, then accepted by it as inevitable. This creates real problems for incarcerated sex offenders who often must "check in" to the Special Housing Unit (i.e., solitary confinement) for their own protection. If not, they are known to be "beat off" a yard, where a group of fellow prisoners knock the sex offender to the ground (often in the chow hall or in front of the lieutenant's office), and stomp them in sight of the prison guards. When this happens, the guards know it's time for the sex offender to be placed in the hole for their own protection (called Protective Custody) and possibly transferred elsewhere.

*See* www.prisonerresource.com/prison-survival-guide.

An article in the Denver Post, dated February 16, 2015, (updated April 24, 2016) titled *Many Sex Offenders Killed in California Prison*, reported that prison gangs have made it their practice to target sex offenders.

https://www.denverpost.com/2015/02/16/many/sex/offenders/killed/in/california/prisons.

Prison officials often attempt to minimize the dangers to people like Frank by placing them in protective custody in a Special Housing Unit where they spend a majority of their time

in isolation. Because fellow inmates will likely learn of Frank's conviction, he could very well find himself segregated from the general population in prison. Unfortunately, while isolation is an easy remedy for prison guards, it is yet another aspect of prison life that can cause severe and lasting psychological damage to an individual, like Frank, who already suffers from depression.

### Frank Will Have to Register as a Sex Offender

The consequences associated with being a convicted sex offender will impact Frank for the rest of his life. He will be required to register as a Sex Offender. Following his sentencing in Federal Court, a judge in Massachusetts, or wherever Frank lives upon release, will review Frank's background and the circumstances of his conviction to determine his sex offender risk level pursuant to the Sex Offender Registry Act (SORA). Frank will have to notify local authorities each time he changes his residence. He will also have to notify authorities of his internet service provider, his screen name and all e-mail accounts. If Frank moves to a different state, he will have to register as a sex offender in the state of his new residence. Even if Frank is classified as a Level 1, or low risk offender, he will be required to remain on the registry for a minimum of 20 years. If he is designated a Level II or III sex offender, he will be required to register for life.

Information about Frank's offense will be available to the public by phone and on the internet. Local law enforcement agencies can, and in some cases must, release the same information to entities with vulnerable populations, such as day care centers, or schools, even if an individual has been designated as a Level I offender. Depending on the assessed risk level, the information may also be shared with his neighbors and other members of the community. Because of these and other collateral consequences, convicted sex offenders struggle to find and

maintain employment; preserve relationships with spouses, family and friends, and obtain suitable housing.  *See* Richard Tewsbury, Ph.D., et. al., *Final Report on Sex Offenders: Recidivism and Collateral Consequences*, University of Louisville (2009).  Sex offenders are frequently targets for harassment and universally condemned.

Frank's actions have forever branded him with the label of convicted sex offender. The resulting consequences of sex offender registration will have a severe and permanent impact on Frank's life and livelihood. The stigma of his conviction, along with its potential impact on his personal and professional life, are relevant consequences for this Court to consider in determining a fair sentence in this case. *See, United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence.").

**Frank Faces a Mandatory Minimum Sentence of 5 Years**

Frank Salerno pled guilty to the crime of receipt of child pornography.  He is therefore facing a mandatory minimum sentence of 5 years.  Although guilty of the crime to which he pled, Frank does not fit the profile of the typical child pornographer.  He has no prior involvement in child pornography or any related activities.  He did not possess a collection of underage materials, nor did he share images or videos with others.  Other than his actions in this case, Frank has never been involved in any activity related to child pornography.

Frank met the victim in this case while playing an online game on his mobile phone.  He did not seek the victim out.  To the contrary, the victim contacted Frank unsolicited.  They began a conversation, which transitioned into what Frank believed was a friendship, and subsequently, a consensual relationship.  In the beginning, Frank had no idea that the victim

was underage.  The relationship eventually turned sexual and Frank asked the victim for naked photographs of herself.  Somewhere along the way, Frank realized that the victim was a minor.  He knows he should have immediately ceased communications, but he did not.  Frank was lonely and depressed and he continued what he knew was an inappropriate online relationship.  At no time during the relationship did Frank attempt to meet with the minor in person.

Several months before his arrest, Frank met his current girlfriend, Chassity Kumlat-Gacusana.  When that relationship began, Frank ended things with the minor victim and thought everything was behind him.  Unbeknownst to Frank, the minor victim's father had already discovered evidence of their communications and turned his daughter's phone over to the FBI.  Some of Frank's last conversations with the minor victim were actually with an undercover agent.

When federal agents showed up at Frank's door, he was fully cooperative.  He acknowledged his wrongdoing and accepted responsibility for his actions.

A sentence of 5 years should be more than sufficient to ensure that Frank will never again engage in similar conduct.

## CONCLUSION

Frank Salerno is incredibly sorry for his actions.  He understands that he must be punished.  However, his punishment began the day he was arrested and will continue for the rest of his life. The path to rehabilitation for Frank is through mental health treatment.  Unfortunately, a lengthy prison sentence will not allow Frank to do this.

Based on all of the above, Frank Salerno respectfully requests that this Court consider his history and characteristics, his need for continued mental health treatment, along with his

acceptance of responsibility and sincere expression of remorse, in determining the appropriate sentence in this case. He respectfully submits that a sentence of the mandatory minimum of 5 years, along with a term of supervision is sufficient, but not greater than necessary, to satisfy the goals set forth in 18 U.S.C. §3553.

Date:   September 25, 2020

     /s/ Jeffrey Ciccone
Assistant Federal Public Defender Federal Public Defender's Office 28 East Main Street, Suite 400
Rochester, New York 14614
(585)262-6201
Jeffery_Ciccone@fd.org
Attorney for Frank Salerno